1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

12

JOHN ANDREW SHEPHEARD, II,

13
                        Petitioner,
14
        v.
15

ROBERT HOREL,      Warden,
16
                        Respondent.
17  _____/

1:05-CV-01162 LJO JMD (HC)

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

18
19          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant
20  to 28 U.S.C. § 2254.[1]
21                              **PROCEDURAL BACKGROUND**
22          Petitioner is currently in the custody of the California Department of Corrections pursuant
23  to a judgment of the Superior Court of California, County of Fresno, following his conviction by
24  jury trial on May 12, 2003 of first degree murder in violation of Cal. Penal Code § 187.[2]  In
25  addition, the jury found true the allegation that Petitioner intentionally and personally discharged
26
27      [1] Pursuant to Fed. R. Civ. P. § 25(d), We substitute Robert Horel, Warden, in whose custody Petitioner
    currently resides, for R. Kirkland, Warden, as the named Respondent.
28
        [2] All further statutory references are to the California Penal Code unless otherwise indicated.

1

a firearm causing great bodily injury or death within the meaning of section 12022.53(d).  The

jury also found true several firearm enhancements; the trial court later struck these

enhancements.  Following his conviction, Petitioner was sentenced to fifty-years-to-life in state

prison.  CT 187; <u>see also</u> CT 159-162.[3]

On or about March 8, 2004, Petitioner timely filed a direct appeal in the California Court

of Appeal, Fifth Appellate District ("Fifth DCA").  <u>See</u> Answer, Exh. 1.  On April 13, 2005, in

an unpublished opinion, the Fifth DCA affirmed the judgment of the trial court.  <u>See</u> Answer,

Exh. 4.

On May 19, 2005, Petitioner filed a Petition For Review in the California Supreme Court.

The petition was denied on June 22, 2005.  <u>See</u> Answer, Exh. 5.

Petitioner filed the instant Petition for Writ of Habeas Corpus on September 6, 2005.  The

Petition raises three claims of error: (1) failure to disclose exculpatory evidence; (2) improper

jury instructions; and (3) insufficient evidence of premeditation and deliberation.

On June 18, 2007, Respondent filed its Answer to the Petition.  Petitioner filed a Traverse

on July 16, 2007.

## FACTUAL BACKGROUND[4]

Kelly Reaves was playing basketball outside his home when his cousin Burnest Williams

drove up and said "Man, these dudes fixin' to jump me."  Earlier, as Williams waited at a stop

sign on his way to Reaves' house, [Petitioner] had thrown a rock from Darryl Stevenson's truck.

Once Stevenson arrived at Reaves' house, [Petitioner] and Williams "ran at each other like it was

a dog fight, just attacked each other, started fighting."  The fight was over "some girl."

[Petitioner] and Williams fought for 10 or 15 minutes.

Stevenson walked toward the two combatants after Williams pinned [Petitioner] to a

fence.  Reaves confronted him: "Hey, what are you doin' man?"  Stevenson pointed a gun at his

---

[3] "CT" refers to the Clerk's Transcript on Appeal; "ACT" refers to the Augmented Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal.

[4] All factual information in this Finding and Recommendation is taken from the factual summary as set forth by the California Court of Appeals in its opinion affirming the conviction.

1  face. [Petitioner] pulled his arm down and said, "We're gonna just do it like this, man, head up,

2  fist to fist, you know?  We gonna fight.  Ain't no need for the gun." [Petitioner] and Williams

3  started to fight again.  Reaves swung at Stevenson, but missed him.

4        [Petitioner] took a gun out of his pocket and fired shots into the air, startling everyone.

5  He said, "Nobody gonna jump on nobody here," and got into Stevenson's truck.  Stevenson got

6  behind the wheel, drove his truck across the street and over the curb, and knocked Reaves and

7  Williams to the ground with his truck.  Reaves got up and fled to safety on foot, but [Petitioner]

8  reached out the passenger window and fired 11 shots into Williams' body.  Williams died of

9  multiple gunshot wounds to the lung, liver and kidney.

**DISCUSSION**

10

11  **I.    Standard of Review**

12        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

13  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

14  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries

15  v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

16  Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

17  521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).

18  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its

19  provisions.

20        Petitioner is in custody of the California Department of Corrections pursuant to a state

21  court judgment. Even though Petitioner is not challenging the underlying state court conviction,

22  28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the

23  threshold requirement of being in custody pursuant to a state court judgment. Sass v. California

24  Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370

25  F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a

26  state prisoner in custody pursuant to a state court judgment, even when the petition is not

27  challenging [her] underlying state court conviction.'").

28        The instant petition is reviewed under the provisions of the Antiterrorism and Effective

3

1   Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

2   70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

3   adjudication of the claim "resulted in a decision that was contrary to, or involved an

4   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

5   of the United States" or "resulted in a decision that was based on an unreasonable determination

6   of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.

7   § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

8          As a threshold matter, this Court must "first decide what constitutes 'clearly established

9   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

10  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

11  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

12  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other

13  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

14  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

15         Finally, this Court must consider whether the state court's decision was "contrary to, or

16  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

17  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

18  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

19  Court on a question of law or if the state court decides a case differently than [the] Court has on a

20  set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

21  at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

22  state court identifies the correct governing legal principle from [the] Court's decisions but

23  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

24  413.

25         "[A] federal court may not issue the writ simply because the court concludes in its

26  independent judgment that the relevant state court decision applied clearly established federal

27  law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

28  A federal habeas court making the "unreasonable application" inquiry should ask whether the

state court's application of clearly established federal law was "objectively unreasonable." Id. at

409.

Petitioner has the burden of establishing that the decision of the state court is contrary to

or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th

Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state

court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied,

537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

**II.   Review of Petition**

**A.   GROUND ONE: Failure to Disclose Exculpatory Evidence**

In his first ground, Petitioner claims his constitutional right to a fair trial was violated

when the prosecution inadvertently failed to disclose the existence of exculpatory and/or

impeachment evidence.  Specifically, Petitioner claims:

> "[T]he prosecution failed to disclose favorable material evidence prior to
> trial of a key eyewitness's [Kelly Reaves] police interview made on audiotape
> containing statements, which if were timely disclosed would have impeached the
> prosecution's key eyewitness.  The prosecution also failed to provide the defense
> with crime scene diagrams made during the interview of Kelly Reaves, and the
> prosecution's failure to make timely disclosure denied Petitioner's right to
> effective cross-examination and the right to a fair trial."

Petition at 8.

**1.   Factual Background**

Weeks after trial, the prosecutor disclosed to the defense by both audiotape and transcript
the text of Reaves' itnerview, disclosed to the defense diagrams he made of the crime scene
during the interview, and informed the defense that the detective who had conducted the
interview had come across those items while cleaning his desk for a new assignment.  The
defense had received none of those items before. [Petitioner] joined in [co-defendant]
Stevenson's new trial motion arguing "significant inconsistencies" between the interview and the
evidence available at trial.  The motion noted discussion about Reaves possibly going to jail after
the interview on an outstanding warrant, about negative references to Williams' character and
propensity for violence, about different stories Reaves told about "the handling of the gun"

[Petitioner] pointed at him, and about Reaves identifying some of the people at the crime scene as his cousins.  The motion argued that the detective misrepresented Reaves' account of Williams' words so as to portray [Petitioner] and Stevenson as the aggressors, omitted Reaves' statement that he told Williams to "just shut up" after the fight, misrepresented Reaves' words to characterize Stevenson as driving at Williams and him instead of wanting to "just take off," and gave details about the fight that were not in the interview.

Before hearing the motion, the court read the detective's report, a transcript of his trial testimony, and a transcript of the interview.  The court made findings that the detective "was attempting to summarize as best he could" Reaves' statements during the interview, that "[t]here are so many inaudibles in this transcript because the person taking it down couldn't understand what [he] was saying," and that "to the extent that there is something on the audio that's not directly in the report...one could have difficulty even interpreting what's in the transcript of the audio."  The court found "half of the tape" was "gibberish" since Reaves "talks in jabs and punches, and stops and talks and, you know, he's everywhere."  The court noted that the jury acquitted Stevenson of assaulting Reaves with a firearm and found that "the jury had substantial problems" with Reaves' credibility.  Finding nothing "substantially different" between the post-trial discovery and the evidence available at trial, the court denied the motion.

## 2.   Legal Standard

The due process clause of the United States Constitution places a *sua sponte* obligation on the prosecution to disclose information to the defense that is within its custody or control which is material to, and exculpatory of, the defendant.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  This constitutional duty to disclose is violated where: (1) the evidence is favorable to the accused in that it is exculpatory or impeachment evidence; (2) the prosecution willfully or inadvertently suppresses the evidence; and (3) prejudice ensues.  See Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (19991); Kyles v. Whitley, 514 U.S. 419, 433 (1995).

Under prong three of this standard, prejudice exists if the withheld evidence is "material." Id.  Evidence is considered material under Brady "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. at 433 (citations and internal quotation marks omitted).  The Kyles court states, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles, 514 U.S. at 434.  To meet this standard, the defense does not have to show that the defendant would have been acquitted had the suppressed evidence been disclosed.  Id. at 434-35.  Nor does the defense have to show that disclosure of the evidence would have reduced the amount of inculpatory evidence

1  below that required to convict.  Id.  The materiality test is "not a sufficiency of the evidence test."

2  Id. at 435.  Rather, a Brady violation exists if "the favorable evidence could reasonably be taken

3  to put the whole case in such a different light as to undermine confidence in the verdict."  Id.

4      If the suppressed evidence is found to be material, the conviction must be set aside – no

5  harmless error analysis is undertaken.  Kyles, 514 U.S. at 435-36; Hayes v. Brown, 399 F.3d 972,

6  984-85 (9th Cir. 2005).

7              3.      State Court Review

8      Petitioner's claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA

9  rejected the claim in a reasoned opinion.

10     In denying Petitioner's claim, the Fifth DCA found as follows:

11          The prosecution has a constitutional duty to disclose material exculpatory
       evidence to the defense whether the record shows a specific request, a general
12     request, or none at all and whether the evidence is within the narrow confines of
       the prosecutor's case files or within the broader scope of the prosecutor's
13     responsibility to ascertain and divulge all favorable evidence known to others
       acting on the prosecution's behalf.  (In re Brown (1998) 17 Cal.4th 873, 879,
14     citing Kyles v. Whitley (1995) 514 U.S. 419, 437; United States v. Agurs (1976)
       427 U.S. 97, 107; Brady v. Maryland (1963) 373 U.S. 83, 87.)  Here, even if not
15     in the prosecutor's case files, the evidence at issue was readily available to the
       prosecution, so "we turn to the question of materiality, for not every nondisclosure
16     of favorable evidence denies due process."  (In re Brown, supra, 17 Cal.4th at p.
       884.)  The test of materiality is whether a reasonable probability exists that the
17     outcome of the trial would have been different had the prosecution disclosed the
       evidence.  (Kyles v. Whitney, supra, 514 U.S. at p. 435.)  Only "by showing that
18     the favorable evidence could reasonably be taken to put the whole case in such a
       different light as to undermine confidence in the verdict" can the defense show
19     that the evidence is material.  (Ibid., citing United States v. Bagley (1985) 473
       U.S. 667). [Petitioner] fails to make the requisite showing.
20

21  Fifth DCA Op. at 4-6.

22              4.      Analysis of Petitioner's Claim

23     The Fifth DCA's finding that Petitioner failed to demonstrate that the evidence was

24  material is not an unreasonable application of the standard articulated in Brady.  28 U.S.C. §

25  2254(d).  Even had the audiotape of Detective Castellano's interview with witness Reaves and

26  the two diagrams made by Reaves during that interview been disclosed to Petitioner prior to trial,

27  there is not a reasonable probability that the outcome of the trial would have been different.

28  Kyles v. Whitley, 514 U.S. at 435.

In his brief on direct appeal to the Fifth DCA, Petitioner claimed Detective Castellano's summary at trial of his interview with Reaves was inadequate in a number of ways, including: (1) Detective Castellano's failure to disclose the discussion occurring at the beginning of the interview regarding whether Reaves would go to jail on an unrelated warrant; (2) Detective Castellano's failure to disclose that Reaves told Williams to "shut up" after the fight, which was inconsistent with Reaves' trial testimony; (3) the failure of the trial summary to report negative references made throughout the interview to the victim's character and/or propensity for violence; and (4) the audio tape indicated that Reaves was not a reliable witness because he gave three different accounts of the handling of the gun pointed at him during the incident.  In the instant Petition, Petitioner claims "it is highly likely Castellano 'intentionally' summarized his report inaccurately and inconsistent with that of the audiotaped statements made by Reaves." Petition at 10-11.  We examine each of Petitioner's claims of material undisclosed evidence in turn.

Petitioner first asserts that witness Reaves felt vulnerable during the interview because he had an outstanding warrant.  The discussion of Reaves' outstanding warrant occurs on the first three pages of the interview transcript.  (ACT 30-33).  In the transcript, Reaves and Detective Castellano discuss an outstanding arrest warrant stemming from a DUI case and involving possible parole violations between 1996-1999.  Reaves explains to the detective that he already served time for the parole revocation, but the warrant for his arrest was mistakenly kept in the system.  (ACT 31).  Detective Castellano asks for the name of Reaves' parole officer at that time, then explains that Reaves will have to appear in court on the warrant and explain to the court that a mix-up in the system had left the warrant open.  (ACT 32).

On direct appeal, Petitioner speculated that Reaves' statements to the police were motivated by a desire to appease the police in light of his outstanding warrant.  However, nothing in the audiotaped interview indicates that Reaves felt vulnerable or that Reaves' statements were somehow influenced by the threat of being returned to jail on the outstanding warrant.  There is no such threat expressed or implied in the transcript.  The interview took place shortly after Reaves fought with Petitioner and his co-defendant, was run over by Petitioner's co-defendant,

and witnessed Petitioner kill his cousin. And the transcript makes clear that Reaves cooperated during the interview because of his involvement in the incident and the murder of his cousin.  We do not find the discussion of Reaves' outstanding warrant to be a material nondisclosure under Brady.

With respect to Petitioner's claim that Detective Castellano's summary failed to report that during the interview Reaves stated that he told Williams to "shut up" after the fight, We likewise do not find this omission material.  In the undisclosed transcript, Reaves states that, after the fight, as he and Williams were walking away, he told Williams to "just shut up." (ACT 51). Detective Castellano's summary at trial of the interview did not include this information. (ACT 75).  Detective Castellano's summary stated that after Petitioner fired a gun into the air two or three times, Petitioner and Stevenson got back into their car, while Reaves and Williams began walking toward Reaves' residence, at which point Stevenson drove his vehicle at them. (ACT 75).

In his new trial motion, Petitioner argued that the evidence that Reaves told the victim to "shut up" after the fight would have demonstrated that the victim was antagonistic throughout the incident.  The lack of the audiotape, Petitioner claimed, made it "much more difficult for the defense to counter the assertion that [Stevenson] and [Petitioner] were the aggressors." (ACT 20-21).  However, Petitioner's argument ignores the other evidence presented at trial that the victim and Reaves were antagonistic toward Petitioner and Stevenson before being run over. Co-defendant Stevenson testified that as he and Petitioner got into the truck to leave, Reaves, Williams, and other bystanders continued yelling and "talking trash." (RT 863-864).  This was confirmed by prosecution witness Justin Black, who  testified that after the fighting stopped, and Petitioner and Stevenson began to leave, Reaves and Williams were talking to Stevenson and "egging" him on. (RT 747).  Moreover, during closing arguments the prosecutor told jurors that words were still being exchanged as Stevenson and Petitioner were walking away.  The prosecutor stated:

> Mr. Reaves testified that he didn't say anything.  But, Ladies and Gentleman, other witnesses who were there that you've heard form said there was [sic] words still exchanged.  There were words exchanged.  And there was something in those

words. Those words is [sic] what caused these two to decide, Huh-uh, we're not goin' out like that. Okay? We're not going to be embarrassed here in front of all these people. We gotta do something.

RT 1041.

Far from denying that the victim was hostile and antagonistic, the prosecution made clear to the jury that Williams was in fact hostile, and that his antagonistic comments caused Petitioner and his co-defendant to make the decision to kill him. In light of the trial testimony by both defense and prosecution witnesses, and the prosecutor's statements, We find no reasonable probability that the outcome at trial would have been different had Reaves' statement that he told Williams to "shut up" been made available to the defense prior to trial.

On direct appeal Petitioner next claimed that Detective Castellano's summary failed to report negative inferences during the interview to the victim's character and/or propensity for violence. Respondent pointed to the following references to Williams' character during the interview: (1) Reaves said he did not know if Williams was in a gang, but that he had some friends in a gang (ACT 66); (2) Reaves said that Williams had "just went to court on a case from his girlfriend" (ACT 66-67); and (3) Reaves stated that Williams was not an "angel," and that he had made some enemies. (ACT 69, 71).

The exclusion of these comments is immaterial in light of the other evidence of the victim's character and history of violence explored at trial. The jury heard about Williams' actions during a birthday party for his girlfriend's daughter. During the party, Williams got into a fight with another individual and brandished a .45- caliber semi-automatic handgun while declaring "I don't care. I'm going to kill all of these 'mother-fuckers.'" (RT 906-907). In addition, prosecution witness Jermaine Wiggins testified that he was with Williams during the encounter which sparked the murder. Wiggins was with Williams when Williams drove a car belonging to William's girlfriend passed Petitioner. (RT 654-655). As they drove by, Williams became upset because he thought Petitioner was looking for Williams' girlfriend in the car. Williams exited the vehicle and began arguing angrily with Petitioner. (RT 654-656). Wiggins testified that Williams was prone to jealous outbursts over his girlfriend, and that he carried a

1   gun.  (RT 947).

2        Given this testimony, Reaves' other references during the undisclosed interview to

3   Williams' character were not material.  His statements that Williams was not an angel, and that

4   he had made some enemies were clear from the aforementioned testimony.  Additionally,

5   Petitioner was provided with discovery on Williams' criminal history before trial, and was able

6   to use that information as part of his defense.  Given the other evidence at trial as to Williams'

7   propensity for jealousy and violent behavior, We find no reasonable probability that the outcome

8   at trial would have been different had Reaves' general statements regarding Williams' character

9   been made available to the defense prior to trial.

10       Finally, Petitioner argued that Reaves gave inconsistent accounts of the handling of the

11  gun after it was pointed at him, and that these discrepancies could have been highlighted at trial

12  to demonstrate that Reaves was an unreliable witness.  However, Petitioner's argument fails to

13  take into account the fact that Reaves gave conflicting accounts of the movement of the gun at

14  trial, as well as in the audiotaped interview.  At trial, Reaves testified that after Stevenson

15  pointed the gun at him, Petitioner reached for the gun and told Stevenson there was no need for

16  it.  Stevenson then put the gun back into the truck.  (RT 444-445).  On cross-examination,

17  Reaves confirmed that Stevenson put the gun back into the truck.  He was then asked about his

18  testimony at the preliminary hearing, in which he stated "[Stevenson] didn't have the gun no

19  more. [Petitioner] had the gun.  I seen [sic] [Petitioner] put the gun in the car."  Reaves replied

20  that he could not remember his earlier testimony.  (RT 539-540, 542).  Reaves also stated on

21  cross-examination that Petitioner got the gun out of the car while the fight was going on, and had

22  it in his pocket as the fight was ongoing.  (RT 547).

23       The absence of the audiotape of Reaves' interview did not prevent the defense from

24  impeaching Reaves' trial testimony.  Rather, after Reaves testified inconsistently at trial, he was

25  thoroughly cross-examined about the inconsistencies in his testimony regarding the handling of

26  the murder weapon.  (RT 539-547).  And these inconsistencies were highlighted for the jury.  We

27  find no reasonable probability that the outcome at trial would have been different had the

28  Reaves' statements regarding the handling of the gun been disclosed prior to trial.

1    We concur with the Fifth DCA that Petitioner failed to demonstrate that the undisclosed

2    evidence was material under <u>Brady</u>.  Accordingly, the claim should be denied.

3    **B.    GROUND TWO:    Improper Jury Instructions**

4    In his second ground for relief, Petitioner claims his due process rights were violated

5    when the trial court gave an erroneous reply to a juror inquiry regarding the meaning of the word

6    "intent."  Petition at 17-20.

7    1.    Factual Background

8    During deliberations, the jury sent a question to the court: "If a person fires a firearm
from a vehicle and intentionally shoots at another person and intends to inflict death is that 1st
9    degree murder?  Please define intent and what the law says about intent."  Out of the presence of
the jury, the court noted a legal dictionary defined intent but not CALJIC instruction did and
10   proposed the court reply to the jury's question with the standard instruction on drive-by murder.
The prosecutor and defense counsel disavowed requesting any other instruction.  On agreement
11   among court and counsel alike, the court instructed the jury: "Murder which is perpetrated by
means of discharging a firearm from a motor vehicle intentionally at another person outside of
12   the vehicle when the perpetrator specifically intended to inflict death is murder of the first
degree."  (CALJIC No. 8.25.1.)

13

14   Asked by the court "whether or not that answers your questions," a juror replied: "The
question, your Honor, is how do they define 'intent' on the law?  Is there a specific definition by
15   law in 'intent' – for 'intent'?  In other words, it has definitions for 'malice' and other different
definitions.  Skimming through the instructions I didn't see a definition for 'intent.'"

16   The court confirmed the juror's reading of the instructions.  "Right.  There is no
definition – specific definition for the word 'intent' in the instructions. [¶] Does that answer your
17   question?"  The juror replied, "Uh-huh.  It does for me."  The record shows no comment or
question by any other juror.  After the court conferred with counsel at sidebar, the same juror
18   asked:

19   "Your Honor, would – is it in the intent to fire the firearm, would that be applied to that
definition?  So you're in the vehicle and you intend to fire the firearm, does that satisfy the
20   definition of 'intent' in the definition that you gave us [on a specified page of the written jury
charge]?"

21

22   The court replied, "I think that's up to you to determine."  The juror said.  "Okay."  The
court added, "I think that's part of your function."  The juror again said, "Okay."  Out of the
23   presence of the jury, the court asked counsel to confirm on the record that at the sidebar neither
had requested the legal dictionary definition of intent.  The prosecutor and defense counsel
24   concurred.  The court asked, "So I'll ask you at this point do you have any objections to anything
[the] court gave or did not give?"  The prosecutor and defense counsel replied in the negative.

25   Not long afterward, the court informed counsel that "apparently one of [the] jurors"
wanted a dictionary.  And at every recess I tell them, and I have told them: You must not
26   independently investigate the facts or the law or consider or discuss facts as to which there is no
evidence."  Out of an abundance of caution, the court again so instructed the jury

27

28   "You must decide all questions of fact in this case from the evidence
received in this trial and not from any other source.  You must not independently

investigate the facts or the law or consider or discuss facts as to which there is no evidence.  This means, for example, [that] you must not, on your own, visit the scene, conduct experiments, or consult reference works or person for additional information.  You must not discuss this case with any other person except a fellow juror and then only after the case is submitted to you for your decision and only when all twelve jurors are present in the jury room. [¶] So you can't refer to encyclopedias or dictionaries or anything of that nature."

2.      Procedural Default

Respondent argues that Petitioner's claim should be denied on the basis of procedural default.  Answer at 19-20.  We turn to the question of procedural default before addressing the merits of Petitioner's claim.

In rejecting Petitioner's claim, the Fifth DCA first held that Petitioner had forfeited the claim by failing to object to the jury instructions at trial.  The opinion of the Fifth DCA states:

Preliminarily, we address the Attorney General's forfeiture argument.  "'No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' [Citations]" (Nguyen v. U.S. (2003) 539 U.S. 68, 88-89).  On a record of his express acquiescence – not once but twice – to the court's handling of the jury's question about intent, [Petitioner] forfeited his right to appellate review of that issue.  (People v. Rodrigues (1994) 8 Cal.4th 1060, 1193).

Fifth DCA Op. at 2-3.

A federal court will not review claims in a petition for writ of habeas corpus if the state court has denied relief on those claims on a state law ground that is independent of federal law and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  This doctrine of procedural default is based on the concerns of comity and federalism.  Id., at 730-32.

There are limitations as to when a federal court should invoke procedural default and refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.  Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).

In addition, the state law ground must be independent of federal law.  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven

with federal law." LaCrosse, 244 F.3d at 704, *citing* Michigan v. Long, 463 U.S. 1032, 1040-41

(1983); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996), *quoting* Coleman, 501 U.S. at

735 ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on

federal law, or to be interwoven with federal law.'")  "A state law is so interwoven if 'the state

has made application of the procedural bar depend on an antecedent ruling on federal law [such

as] the determination of whether federal constitutional error has been committed.'" Park v.

California, 202 F.3d 1146, 1152 (9th Cir. 2000), *quoting* Ake v. Oklahoma, 470 U.S. 68, 75

(1985).

Also, a federal court may only impose a procedural bar on claims if the procedural rule

that the state used is adequate to support the judgment. To be adequate, "the state's legal grounds

for its decision must be firmly established and consistently applied." King v. LaMarque, ___ F.3d

___, 2006 WL 2684539 *1 (9th Cir. 2006), *citing* Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

2003). To be firmly established and consistently applied, the rule must be clear and certain. King,

2006 WL 2684539 *1, *citing* Melendez v. Pliler, 288 F.3d 1120, 1124 (9th Cir. 2002); see also

Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (The state procedural rule used must be

clear, consistently applied, and well-established at the time of the petitioner's purported default).

If the court finds an independent and adequate state procedural ground, "federal habeas

review is barred unless the prisoner can demonstrate cause for the procedural default and actual

prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501

U.S. at 750; Park, 202 F.3d at 1150.

In this case, the California Supreme Court denied Petitioner's state habeas petition with

citation to People v. Rodriguez, 8 Cal.4th 1060, 1193 (1994), on the grounds that Petitioner had

forfeited his claim by failing to object to the jury instructions at the time they were given.

California's contemporaneous objection rule is applied independent of federal law.  People v.

Williams, 16 Cal.4th 153, 208 (1997); see also Vansickel v. White, 166 F.3d 953, 957-58 (9th

Cir. 1999) (recognizing and applying California's contemporaneous objection rule in affirming

denial of a federal petition on the ground of procedural default); Bonin v. Calderon, 59 F.3d 815,

842-43 (9th Cir. 1995) (sustaining the state court's finding of procedural default where defendant failed to make any objection at trial). In addition, the contemporaneous objection rule is adequate, as California courts have consistently applied it. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We held more than twenty years ago that the rule is consistently applied when a party has failed to make *any* objection to the admission of evidence."), *citing* Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999); Bonin v. Calderon, 59 F.3d 815, 842-43 (9th Cir. 1995).

Accordingly, Petitioner's claim is procedurally defaulted unless he can demonstrate cause and prejudice, or a fundamental miscarriage of justice. Given that Petitioner's trial counsel twice assented to the trial court's handling of the jury's inquiries, Petitioner cannot demonstrate the requisite cause for his default. Nor has Petitioner demonstrated that a fundamental miscarriage of justice will result if this claim is barred. Thus, Petitioner has procedurally defaulted this claim. Nonetheless, the Court will address the claim as it is also without merit.

### 3.    State Court Review of the Merits

After finding that Petitioner had forfeited his claim, the Fifth DCA went on to address Petitioner's claim on the merits as follows:

> In any event, [Petitioner's] claim has no merit. He argues "the court's final answer to the foreman's follow-up questions effectively removed the requirement that the perpetrator specifically intended to inflict death," but by saying "that's up to you to determine" and "that's part of your function" the court simply referred the jury to instructions already given. (See People v. Beardslee (1991) 53 Cal.3d 68, 97; see e.g., CALJIC Nos. 1.00 [charging jury with duties to apply law as stated by court and to determine facts as proved by evidence], 2.00 [permitting proof of facts by direct and circumstantial evidence and by inference], 2.01 [requiring not guilty verdict if circumstantial evidence reasonably points to guilt and innocence alike], 8.20 [defining willful, premeditated, and deliberated killing as requiring intent to kill], 8.31 [defining second degree murder as not requiring intent to kill], 8.40 [defining voluntary manslaughter as not requiring intent to kill], 8.71 [requiring jury to give benefit of doubt as between first degree murder and second degree murder], and 8.72 [requiring jury to give benefit of doubt as between murder and manslaughter].
> The appellate court looks at instructions as a whole, not in isolation. People v. Castillo (1997) 16 Cal.4th 1009, 1016. In the absences of a contrary showing, we presume jurors follow instructions. People v. Stanley (1995) 10 Cal.4th 764, 837. "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient." People v. Johnson (1988) 47 Cal.3d 576, 591. Petitioner fails to make the requisite showing.

Fifth DCA Op. at 2-3.

1          4.      Legal Standard

2          To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

3   the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

4   process.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  Additionally, the instruction may not be

5   judged in artificial isolation, but must be considered in the context, taking into consideration the

6   overall charge to the jury as a component of the entire trial process.  Id.; see also United States v.

7   Frady, 456 U.S. 152, 169 (1982), citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

8          Furthermore, even if it is determined that the instruction violated the petitioner's right to

9   due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

10  influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson,

11  507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in

12  determining the jury's verdict).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The

13  burden of demonstrating that an erroneous instruction was so prejudicial that it will support a

14  collateral attack on the constitutional validity of a state court's judgment is even greater than the

15  showing required to establish plain error on direct appeal.  Id.

16          5.      Analysis of Petitioner's Claim

17          The determination of the Fifth DCA is neither contrary to nor an unreasonable application

18  of clearly settled Supreme Court law.  Petitioner argues that the trial court's response to juror

19  number seven's final oral question "effectively removed the requirement that the perpetrator

20  specifically intended to inflict death," and mistakenly told the jury that intent to fire the gun

21  satisfied the definition of "intent" in CALJIC No. 8.25.1.  Petition at 18-19.  We find, when

22  viewed in light of the overall jury charge, that no reasonable jury could so interpret the trial

23  court's statements.  Asked by the jury to define "intent," the trial judge first conferred with both

24  the prosecutor and defense counsel and confirmed that they did not wish to further define the

25  term beyond its definition in the given instructions.  The trial court went on to reiterate the

26  applicable legal standard for a finding of first degree "drive-by" murder, using CALJIC No.

27  8.25.1, which states: "Murder which is perpetrated by means of discharging a firearm from a

28  motor vehicle intentionally at another person outside of the vehicle when the perpetrator

16

specifically intended to inflict death is murder in the first degree." When asked if there was a specific definition for the term "intent" as used in these instructions, the trial court properly informed the jury "There is no definition – specific definition for the word 'intent' in the instructions." In light of these statements, the trial court's response to the final juror question regarding the definition of "intent" cannot reasonably be interpreted as an instruction that the jury could find the requisite specific intent to kill based solely on a finding of intent to discharge a firearm.

Instead, as the Fifth DCA states, by saying "that's up to you to determine," and "that's part of your function," the trial court simply referred the jury to instructions already given. These instructions included: CALJIC No. 1.00 (jury's duty to apply the law as stated by the court and to determine the facts as proved by the evidence); No. 2.00 (permitting proof of facts by direct and circumstantial evidence and by inference); No. 2.01 (requiring not guilty verdict if circumstantial evidence reasonably points to both guilt and innocence); No. 8.20 (defining willful, premeditated, and deliberate killing as requiring intent to kill); No. 8.25.1 (the aforementioned "drive-by" murder instruction); No. 8.31 (defining second degree murder as not requiring intent to kill); No. 8.40 (defining voluntary manslaughter as not requiring intent to kill); 8.71 (requiring the jury to give the benefit of the doubt as between first degree and second degree murder); 8.72 (requiring that the benefit of the doubt be given as between murder and manslaughter). Overall, these instructions make clear that a finding of first degree murder requires that the jury find that the defendant intent to kill the victim.

In light of this, the complained-of instruction does not by itself so infect the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Accordingly, Petitioner's claim should be denied.

## C.    GROUND THREE:  Insufficient Evidence

In his third and final claim, Petitioner asserts a violation of his due process rights in that there was insufficient evidence of premeditation and deliberation to support his conviction for first degree murder.

///

1        1.      Legal Standard

2        In reviewing sufficiency of evidence claims, California courts expressly follow the

3    Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979).  See People v.

4    Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).

5    Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual

6    finding is fairly supported by the record is as follows:

7            "[W]hether, after viewing the evidence in the light most favorable to the
             prosecution, any rational trier of fact could have found the essential elements
8            of the crime beyond a reasonable doubt."

9    Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

10       This Court must presume the correctness of the state court's factual findings. 28

11   U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of

12   correctness applies to state appellate determinations of fact as well as those of the state trial

13   courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of

14   correctness does not apply to state court determinations of legal questions or mixed questions of

15   law and fact, the facts as found by the state court underlying those determinations are entitled to

16   the presumption.  Sumner v. Mata, 455 U.S. 539, 597 (1981).

17       1.      State Court Review

18       Petitioner's claim was first presented on direct appeal in the Fifth DCA.  In rejecting

19   Petitioner's claim, the Fifth DCA stated:

20           Our duty on a challenge to the sufficiency of the evidence is to determine
         "whether, on the entire record, a rational trier of fact could find the defendant
21       guilty beyond a reasonable doubt."  (People v. Jones (1990) 51 Cal.3d 294, 314).
         Our task is to "'review the whole record in the light most favorable to the
22       judgment below to determine whether it discloses substantial evidence – that is,
         evidence which is reasonable, credible, and of solid value – such that a reasonable
23       trier of fact could find the defendant guilty beyond a reasonable doubt.'
         [Citation.]" (People v. Hillhouse (2002) 27 Cal.4th 469, 496).  Our role is limited
24       to determining whether, on the entire record, viewing the evidence in the light
         most favorable to the prosecution and presuming in support of the judgment every
25       fact reasonably inferrable from the evidence, a rational trier of fact could find the
         accused guilty beyond a reasonable doubt.  (People v. Ochoa (1993) 6 Cal.4th
26       1199, 1206).
             The [California] Supreme Court's guidelines for appellate review of the
27       sufficiency of evidence of premeditation and deliberation identify three basic
         categories for analysis: "(1) planning activity, (2) motive, and (3) manner of
28       killing." (People v. Perez (1992) 2 Cal.4th 1117, 1125, citing People v. Anderson

18

(1968) 70 Cal.2d 15, 27).  Here, as to planning activity, the jury reasonably could have inferred from the evidence at trial that [Petitioner] aggressively pursued Williams, jumped him as soon as he arrived at Reaves' house, and killed him with a loaded gun he brought with him.  As to motive, the jury reasonably could have inferred from the evidence that [Petitioner] had multiple motives, ranging from jealousy over "some girl" to embarrassment from Stevenson's walking over as if to intervene after Williams pinned him to the fence, to revenge for Williams having bested him in the physical altercation.  As to manner of killing, the jury reasonably could have inferred from the evidence at trial that [Petitioner] repeatedly shot Williams at close range because he was intent on inflicting death. In short, though perhaps allowing for other possibilities, the evidence nevertheless supports the finding of a rational trier of fact that [Petitioner] committed first degree premeditated and deliberate murder.

Fifth DCA Op. at 3-4.

### 3.    Analysis of Petitioner's Claim

The determination of the Fifth DCA is not an unreasonable application of the standard articulated in Jackson.  There is sufficient evidence in the record to sustain a finding of willful, deliberate, and premeditated murder under the three categories identified in People v. Anderson, 70 Cal.2d at 26-27.  First, there is sufficient evidence on the record of planning.  As the Fifth DCA notes, Petitioner followed the victim to Reaves' house, brought a loaded gun with him, engaged in an altercation with the victim, and thereafter used the gun to kill the victim.  It is reasonable to infer based on the record that Petitioner and Stevenson pursued the victim to Reaves' house in order to cause him harm.  After the victim and Petitioner exchanged words, the evidence showed that Petitioner and Stevenson followed the victim as he drove off, and threw a rock at the victim's car while he was stopped at a stop sign.  (RT 636-637).  The victim, believing he was going to be attacked, drove to Reaves' home for protection.  (RT 434-36, 516, 588, 593, 631-32).

Upon arriving at Reaves' house, Petitioner engaged in a physical altercation with the victim, lasting several minutes.  (RT 437-38, 448).  At one point during the fight Petitioner fired a handgun, demonstrating his willingness to use deadly force.

With respect to motive, as the Fifth DCA notes, a reasonable trier of fact could infer from the evidence that Petitioner had a number of motives to murder the victim.  First, there was evidence that Petitioner and the victim had a verbal altercation prior to Petitioner's arrival at Reaves' house.  (RT 654-56).  In addition, a reasonable jury could find that Petitioner was

motivated by jealousy over a girl, or by revenge and embarrassment over being bested by the victim in their altercation. Petitioner was pinned to a fence by the victim at one point; at another point during the altercation the victim slammed Stevenson's neck and back into the wheel well of a truck. (RT 439-42, 444-48, 451-53. 526-27, 567). A jury could reasonably have inferred that Petitioner murdered the victim because the victim beat Petitioner and his friend.

Finally, there was sufficient evidence on the record to support a finding that the manner of killing was indicative of premeditation and deliberation. At the time he was killed, the victim was attempting to rise to his feet after having been run over by Stevenson. Petitioner reached out of the passenger side window and fired a gun at the victim four or five times. (RT 457). After pausing, Reaves witnessed Petitioner shoot the victim several more times. (RT 460). The victim was shot a total of eleven times. (RT 819-20). A rational jury could have found that Petitioner's act of firing a gun eleven times at close range at a victim who had just been knocked to the ground by a vehicle was indicative of a deliberate and premeditated decision to kill the victim.

The Fifth DCA correctly articulated and applied the <u>Jackson</u> standard for determining the sufficiency of the evidence to sustain a finding of guilt for first degree murder in this case. Accordingly, Petitioner's claim should be denied.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     The petition for writ of habeas corpus be DENIED; and

2.     Judgment be ENTERED in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

636 (b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    April 8, 2008**                      **/s/ John M. Dixon**
                                        UNITED STATES MAGISTRATE JUDGE

21